## In re BIGLARI IMPORT EXPORT, INC., Debtor.

### Bankruptcy No. 90–52552–C.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

June 17, 1991.

Diann M. Bartek, Patrick L. Huffstickler, Cox & Smith Inc., San Antonio, Tex., for International Bank of Commerce.

Steven G. Cennamo, Waitz, Greer & Cennamo, P.C., San Antonio, Tex., for debtor.

Seymour Roy, New York City, Eric R. Turton, San Antonio, Tex., for creditors committee.

Benjamin T. Head, San Antonio, Tex., U.S. Trustee.

## MEMORANDUM DECISION

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Objection of Biglari Import Export, Inc. d/b/a The Ritz Oriental Rug Gallery ("Debtor/Biglari") to the Claim of International Bank of Commerce ("IBOC"). The Debtor argues that IBOC's claim should be reduced by $30,214.00, the cost of ten Persian rugs which showed up missing when an inventory of the rugs pledged to IBOC was taken in December 1990. For the reasons stated in this decision, the objection will not be sustained.

### JURISDICTION

This court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and may enter a final order with respect thereto. 28 U.S.C. § 157(c)(2). This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(A), (B).

### FACTUAL BACKGROUND

Biglari Import Export, Inc. operates The Ritz Oriental Rug Gallery. In 1986, Biglari borrowed operating capital from IBOC, granting a lien on its inventory of rugs (among other things). Later in the lending relationship, IBOC became concerned about the Debtor's business and loan performance. It asked that some of the rugs be pledged to the bank. Biglari complied, ultimately delivering forty rugs into IBOC's possession.

IBOC stored the rugs in a storage room in its bank building. The room, though not designed as a collateral storage vault, is the same room in which the bank stores its

own records. It has a concrete floor, no windows, and no public access. The room is located toward the rear of the building, on an upper level (this is the only room on that level). There is a winding stairway which runs down to a vestibule area, which area in turn has one door out to a fenced courtyard and one door into the employee-only area of the bank. The back door is kept locked, and only bank officers have a key to the door.

The rugs were, according to the witnesses, removed from this room on only two occasions, once in July 1988 and again in March 1990. On both occasions, it was the Debtor which took out the rugs and brought them back. The first time, the Debtor clearly had the bank's permission. The second time, though the evidence is contradictory, it is more than likely that the removal was authorized.

No one questions that all forty rugs were returned after the first time.[1] The second time, however, is a different matter. In March 1990, the Debtor removed all forty rugs so they could be aired out in the sun and mothballed (the standard procedure for maintaining the quality of the rugs). One of the Debtor's employees (along with an assistant) picked up the rugs over the lunch hour one day, while the bank officer in charge of this loan was away from the office. The employees told bank personnel that the loan officer had approved their coming by to pick up the rugs, and someone from the bank let them into the storage room. No one had the employees sign any paperwork relative to checking the rugs out. The rugs were in bundles of three or four rugs each.

Three days later, after the mothballing process, two Biglari employees brought the rugs back to the bank. No one from the bank checked the bundles to be sure that all forty rugs were there. The rugs were put back in the storage room, where they remained undisturbed. The employee re-

sponsible for delivering the rugs back to the bank left the Debtor's employ sometime during the summer of 1990 and now lives in Canada. When an inventory of the rugs at the bank was taken in December 1990, the bank came up ten rugs short. This objection followed.

## ANALYSIS

The law applicable to this matter is Section 9–207 of the Uniform Commercial Code. *See* TEX.BUS. & COMM.CODE, § 9.207 (Vernon Supp.1991). That section, in applicable part, says that

> (a) A secured party must use *reasonable care* in the custody and preservation of collateral in his [sic] possession....

*Id.*, § 9.207(a) (emphasis added). The question is whether, under the facts of this case, it can be said that IBOC used "reasonable care" in the custody and preservation of Biglari's rugs. If it did not, then it "... is liable for any loss caused by his [sic] failure to meet any obligation imposed by the preceding subsections but does not lose his [sic] security interest." *Id.*, § 9.207(c).

The bank offers one Texas case in support of its position. *Morin v. General Motors Acceptance Corp.*, 602 S.W.2d 596 (Tex.Civ.App.—Eastland 1980, writ ref'd n.r.e.). There, the facts showed that a 1973 Chevrolet Nova had an engine when GMAC repossessed the vehicle, and did not have an engine when the debtor redeemed the vehicle. The court affirmed the trial court's judgment *non obstante veredicto*, because there was no evidence as to whose negligence caused the disappearance of the engine. Observing that this was neither a res ipsa loquitur case nor a bailment case, the court concluded that the record indeed failed to establish that the secured party had not used reasonable care. *Id.* at 597–98; *see also First National Bank, Giddings v. Helwig*, 464 S.W.2d 953, 955 (Tex.

---

1. According to the Debtor, at the bank's request, Biglari took the rugs down to the bank's main office in Laredo, Texas to be examined by bank personnel there. Biglari signed a trust receipt, in which Biglari promised the bank that the rugs would be returned in the same condition (or the proceeds of their sale, if sold, would be remitted). The obvious purpose of the trust receipt was to protect the bank's interest in its collateral, not to protect Biglari's ownership rights in the rugs.

Civ.App.—Austin 1971, no writ) (creditor has duty of ordinary care to secure and preserve property, and claimant must affirmatively establish breach of that duty).

Under *Morin*, the Debtor has the burden of establishing IBOC's breach of the duty to use reasonable care. *Morin, supra* at 597; *cf. Credit Alliance Corp. v. Timmco Equipment, Inc.*, 3 U.C.C.Rep. Serv.2d 1995, 507 So.2d 657 (Fla.App.1987) (in Florida, the relationship is analogous to a bailment, so that loss of collateral raises a rebuttable presumption of negligence). If the facts in *Morin* did not establish the creditor's liability in that case, then certainly the bank here cannot be liable under the reasonable care standard just because the rugs showed up missing. *Id.* at 597. Given that there was just as much evidence to suggest wrongdoing on the part of the Debtor or its employees,[2] the court here can no more charge the bank with liability based solely on the disappearance of the rugs than could the court in *Morin* find GMAC liable solely for the disappearance of the car engine.

The basic manner in which the rugs were stored satisfies the "reasonable care" standard of Section 9.207(a) anyway. The room, while not expressly designed for the purpose of storing rugs, is adequately secure, confirmed by the fact that the same room houses the bank's own records. In addition, the access is limited to bank employees and only officers have keys to the back door. The "reasonable care" standard imposes no greater obligations than these for storing and preserving these rugs.[3]

The Debtor highlights the "mothballing" incident, pointing to the bank's letting the rugs out to two employees of Biglari on their bald oral representation of authority, and to the bank's failure to confirm that all forty rugs were in fact returned three days later. The Debtor argues that this laxity in the bank's procedures for handling the collateral violated the reasonable care standard of Section 9.207. According to the Debtor, the bank should have required proper express authorization from a bank officer before it permitted anyone into the collateral storage area, much less permitted the removal of any of the collateral. Furthermore, had the bank just counted the rugs when they came back after the mothballing, they would have caught the shortfall immediately (assuming that this is when the shortfall occurred) and could have contacted the Debtor immediately, presumably so that prompt steps to intercept the dishonest employee could be taken.[4]

The Debtor's argument overlooks the fact that it was to the Debtor's own employees that the rugs were released, and it was the Debtor's employees who brought the rugs back to the bank three days later. The bank cannot have a responsibility for the conduct of the Debtor's employees any greater than the Debtor's own responsibility. *See Butte County Bank v. Hobley*, 109 Idaho 402, 42 U.C.C.Rep.Serv. 762, 767–68, 707 P.2d 513 (Idaho App.1985) (bank only in constructive possession of hay not liable for missing hay where hay was in actual possession of the debtor).[5]

---

**2.** No insurance claim has been made for these ten missing rugs. The Debtor has also alleged that 189 rugs were stolen from a truck in McAllen, Texas, though the insurance company has refused to pay on the loss because the police report failed to show any evidence of forced entry. The insurance company has also refused to honor another claim for alleged water damage to the rugs at the store.

**3.** The Debtor's principal admitted that he never complained to the bank that the room was not a secure location, only that it was dank.

**4.** If this is not when the ten rugs disappeared, the Debtor maintains that the bank should have at least been able to establish that any loss did

not occur as a result of its failure to be careful in its handling of the collateral's removal and return from the storage area. The *Morin* case disposes of this last contention.

**5.** In *Hobley*, the bank had the right to immediate possession of the hay. However, the hay was left at the farm for buyers to pick up. Some of the hay belonged to the debtor's relatives, while the rest was the bank's collateral. The bank could not account for all of the hay, so the debtor asked for a credit for the missing hay, but the court declined, observing that "the hay was located on the Hobleys' farm and under their control until it was sold ... IC. § 28-9-207(2)(b) places the risk of loss on the Hobleys."

When the conduct in question goes beyond mere negligence to suggestions of fraud or illegality, the responsibility for their conduct, as between the Debtor and the bank, becomes crystal clear. In essence, the Debtor maintains that the bank had a duty to protect the Debtor from itself. That is hardly reasonable. *Id.; see Bud–Lee Ski Centers, Inc. v. State of New York,* 116 A.D.2d 715, 497 N.Y.S.2d 768, 42 U.C.C.Rep.Serv. 1789, 1790 (1986) (claimant failed to establish unreasonable care on part of secured party which permitted the removal of claimant's property by other secured and judgment creditors of claimant). Lenders who release collateral to their debtors (including employees and agents of debtors acting within the scope of their employ or agency) cannot be liable under Section 9.207 for losses occasioned by the misfeasance or malfeasance of those employees or agents, nor are lenders required under that statute to institute mechanisms to protect debtors from the malfeasance or misfeasance of their own employees. *See Bud–Lee Ski Centers, Inc.,* 42 U.C.C.Rep.Serv.2d at 1790, 497 N.Y.S.2d 768.[6]

For the foregoing reasons, the court concludes that the Debtor has failed to sustain its burden of proof. The objection is therefore denied. A form of order consistent with this decision shall be tendered by counsel for IBOC.

---

*Id.* at 768, 707 P.2d 513. The Texas version of that section provides that

> (b) Unless otherwise agreed, when collateral is in the secured party's possession

> .        .        .        .        .

> (2) the risk of accidental loss or damage is on the debtor to the extent of any deficiency in any effective insurance coverage.

TEX.BUS. & COMM.CODE, § 9.207(b)(2). The section may not support the conclusion of the *Hobley* court, though that decision seems correct in any event.

**6.** A different result might obtain had the employees not in fact been told by their employer to go pick up the rugs for mothballing, and had the rugs then been carted off to the Mexican border for quick resale by the soon-to-be former employees. Too, the outcome of this case might be different were it an unrelated *guarantor* complaining of the release of collateral to a debtor who then absconded with it. *See Central Virginia Bank v. Bell,* 9 U.C.C.Rep.Serv.2d 422, 424–25 (Va.Cir.1989); *Signer v. First Nat. Bank & Trust Co. of Covington, Kentucky,* 9 U.C.C.Rep. Serv. 1332, 455 F.2d 382 (6th Cir.1971).